## Chesapeake & Ohio Railway Co., et al. v. Savage.

(Decided October 29, 1912.)

Appeal from Carter Circuit Court.

1. Railroads—Trial—Peremptory.—Where there was evidence on the part of plaintiff tending to support the charge of negligence, the court properly refused to direct a verdict for defendants.

2. Railroads—Trial—Verdict—Weight and Sufficiency.—Evidence examined and held, verdict not flagrantly against the weight of the evidence.

3. Railroads—Operation—Licensees and Trespassers.—A member of a wrecking crew, whose cars under their control made up part of a freight train, who, while the train was proceeding to the scene of a wreck, went to the caboose in the execution of an order from his superior and remained, after the execution of the order, in a seat in the cupola of the caboose until thrown therefrom by a sudden jerk of the train and injured, will not be held to be a licensee or trespasser, in the absence of a rule of the company denying to an employe the right to ride in the cupola, or when riding therein with the knowledge and consent of the conductor in charge of the train.

4. Railroads—Damages—Excessive Verdict.—For a broken arm, the use of which was not recovered in a year and a half; a bruised hip, which, during that time, prevented plaintiff from doing heavy work; confinement in the hospital for twenty-eight days; and pain, then and thereafter, suffered, a verdict for $3,000.00 is not excessive.

SHELBY & SHELBY, R. L. NORTHCUTT, WILHOIT & WILHOIT and H. L. WOODS for appellants.

SCOTT & HAMILTON and ARMSTRONG & DUVALL for appellee.

OPINION OF THE COURT BY JUDGE LASSING—Affirming.

James Savage in May, 1909, was, and for some years prior thereto had been, in the employ of the Chesapeake & Ohio Railway Company in various capacities. On May 10 of that year, he was employed by said company as a car repairer, and worked in connection with the wrecking crew, out of Lexington, Ky. A freight car had been derailed at Brady's switch, and the wrecking crew was directed to go to that point and replace the car on the track. This wrecking crew had a wrecking outfit

consisting of six cars, one of which was loaded with extra wheels, and another was a diner, in which the men cooked, ate, and rode to and from the wreck. There were four other cars equipped with wrecking tools and material, that might be needed in making temporary repairs to cars and clearing away the wreckage. About the time that word had been received by the wrecking crew to clear the wreck, a freight train was going east, and the six wrecking cars used by the wrecking crew were attached to the rear end of this freight train, which consisted of twenty-nine cars. The caboose, used in connection with the freight train, was coupled to the rear end of the cars of the wrecking crew, so that the train, when it left Lexington, consisted of an engine, twenty-nine freight cars, followed by the six wrecking cars, and the caboose. In this way the train proceeded upon the road, past Winchester, Mt. Sterling and Olympia, at which latter point, Savage was directed by the foreman of the wrecking crew to go to the caboose and ascertain from the conductor in charge of the train, on which side of the track the wrecked freight car was derailed. As the train moved out, he caught the caboose, as it passed him, and asked the conductor, who at the time was going up into the cupola, which side of the track the wrecked car was on. The conductor, in response to this question, told him that he did not know. This caboose was provided with seats on the floor, as well as seats for two persons in the cupola. The conductor went up into the cupola, and was followed by Savage. There is conflict in the testimony of the conductor and Savage, as to how he came to go. Savage says that he went there at the invitation of the conductor; while the conductor testifies that he came up there without invitation, though it is evident, from the testimony of both, that Savage went there for the purpose of carrying on a social conversation with the conductor. But, whether invited there or not, it is apparent that he remained there with the knowledge and consent of the conductor. They chatted pleasantly from the time they entered until the train was pulling into Midland, at which point the engine had to take water and coal. It slowed up, the rear brakeman went out on the front platform of the caboose, the conductor climbed down out of the cupola, and when the train came to a stop, Savage fell from his seat in the cupola to the floor below, a distance of something like seven feet, sus-

taining injuries, consisting of a broken arm and bruises about the body. He brought suit against the company, in which he sought to recover damages for his injuries, upon the theory that the train, when in the act of being stopped, was given such a violent, sudden and unusual jerk, that he was entirely thrown from his seat. The company denied liability and pleaded contributory negligence. Upon these issues the case was submitted to a jury, with the result that a verdict was returned in favor of plaintiff for $3,000, and from the judgment predicated thereon the company appeals.

At the conclusion of plaintiff's testimony, and again at the conclusion of all the testimony, the defendant moved for a peremptory instruction, and it is now urged, as a ground for reversal, that the court erred in declining to entertain this motion. The negligence, relied upon by the plaintiff to support his recovery, is that the car was given an unusual, violent and unnecessary jerk. The plaintiff testifies to this fact, and we cannot say that his testimony is not some evidence that the bump was of this character. William Taylor, the cook, who at the time was riding in the dining car, which was provided with passenger springs, testifies upon this point: "It was a pretty good jar. * * * We have had some jars, of course, equal to it. We have had jars since I have been running with the car, in four or five years, just the same as that jar all right enough. Q. What were you doing when the accident happened there? A. I had hold of the table. Q. What did it do to you in the jar? A. Ed. Thomas was coming by me with a table, he was taking a table out. Q. What did it do to you, where were you going? A. Oh, what happened to me—I butted up against the wall."

C. J. Lowry, the rear brakeman, testifies: "Standing on the front end of the caboose, platform of the caboose. Q. State how you happened to be there at that time? A. Well, I went out on the front end of the caboose when he whistled for Midland, always look over your train that way when you come to a stop."

"Q. Describe in your own way just how that stop was made and whether there was anything peculiar about it? A. Well, he just pulled up and stopped, I don't know how it was on the head-end. I don't think it was any fault of the engine though. I think it was on account of them tool cars being next to the caboose is all

I knew of it.   Q. What effect did this stop have on you and what did you do at the time?   A. I was standing on the front end of the caboose, and it throwed me over against the brake wheel, I caught the brake wheel, caught hold of the brake wheel.   Q. What was there about that stop that made it different from the usual stop?   A. Well, when he stopped the slack ran up on the train a right smart jar on the caboose is all I know.   Q. Describe the stop as to suddenness?   A. I don't think it was a sudden stop, probably we went eight or ten feet after the jar."

When the evidence of this witness and Taylor, the cook, is considered in connection with that of appellee, it is apparent that the trial judge would not have been warranted in directing a peremptory in favor of appellant.   The testimony of both the cook and rear brakeman corroborate that of appellee, to the effect that there was a sudden jar or jerk, which, according to the testimony of the rear brakeman, caused the train to move eight or ten feet forward, after the jar, occasioned by the running out of the slack.   Nor can we agree with counsel for appellant that the verdict is flagrantly against the evidence, for the jury, upon this testimony alone, would be warranted in finding that there was an unusual jar or jerk.   The cook says that during the period of his four or five years railroad experience, he had seen jars, perhaps as heavy as this one, but he does not say that, in all his experience, he had seen one that was any heavier than this one.   Upon this testimony, we cannot say that the plea of sudden, violent and unusual jerking, is not sustained by evidence; and this is especially true, when taken in connection with the evidence of appellee and of the rear brakeman.   The jar was violent enough not only to throw appellee from his seat in the cupola to the floor below, but to throw the cook, who was riding in a well equipped dining car, against the wall, and to have thrown the rear brakeman from the platform of the caboose, if he had not seized the brake.   As to what caused the jar, the evidence is not clear.   The engineer says that the train was equipped with air brakes, and the air was put on so that it applied to all of the cars in the train at the same time. If he is correct in this, which he doubtless is, then the jerking, which threw appellee from his seat in the cupola, must have been occasioned by the sudden forward

movement of the train after it has first been stopped, and this idea finds strong support in the testimony of the rear brakeman, who says that, in his judgment, the train moved eight or ten feet forward after the jar.

It is next insisted that appellee had no business in the cupola, which was not nearly so safe a place to ride as in the seats on the floor of the caboose. There might be some force in this argument or contention, if appellee had been in the cupola without the knowledge or consent of the conductor, who had charge of the train. The conductor says he did not invite him there, but he suffered him to remain there and conversed with him while he was there. Aside from this, appellee was an employee of the company and had a right to be upon this part of the train; he had been sent back from the dining car to the caboose to ascertain from the conductor which side of the track the wrecked car was on; it was while the train was in motion, that he entered the caboose; he could have gone over the train back to the dining car, but it was perhaps safer for him to remain in the caboose than to attempt to return to his station in the dining car, while the train was moving. Certainly it was not negligence on his part to remain in the caboose; and, since the caboose is provided with seats, both on the floor and in the cupola, in the absence of some rule denying to employes of the company, who are rightfully on the train, the right to ride in the cupola, we would hold that, inasmuch as it is provided with seats for the accommodation of employes, it is not negligence for them to ride in those seats.

Lastly, it is insisted that the verdict is excessive, and that the judgment should be reversed on that ground. The proof shows that appellee was sufficiently injured to cause him to be confined in the hospital in Lexington for twenty-eight days; his arm was broken; and he was otherwise injured about the body and particularly the hip. The trial occurred in October, 1911, and at that time he was still complaining that he had not recovered fully the use of his arm; that his hip bothered him to such an extent that he could not do heavy work; and that while he was in the hospital and for sometime thereafter, his injuries gave him pain. Under this evidence, we would be unwilling to say that the sum awarded was excessive. He may not be permanently injured, but, as he had not entirely recovered at the time

of the trial, which took place a year and a half after the injury, the jury, from an examination of his hand and arm and from his general appearance, may have been justified in believing that the injury was permanent. The evidence upon this point is meager, but it is sufficient to enable us to know that, whether permanent or not, his suffering had been such as to justify the jury in awarding the sum, which it did.

Upon the whole case, we find no reason for disturbing the judgment, and it is, therefore, affirmed.